UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | : | |
| | : | |
| STATE OF CONNECTICUT, | : | |
| OFFICE OF ATTORNEY GENERAL, and | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | CIVIL ACTION NO.15-5777 |
| OFFICE OF ATTORNEY GENERAL, | : | |
| | : | |
| Plaintiffs | : | |
| v. | : | |
| | : | |
| CLICK4SUPPORT, LLC, | : | |
| a Connecticut limited liability company, et al | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants | : | |

_____

## ORDER

AND NOW this_____, day of _____, 2015, upon consideration

of Defendants Spanning Source, LLC, George Saab, Chetan Bhikhubhai Patel and Niraj Patel

Motion for Live Testimony at the Preliminary Injunction Hearing Pursuant to §XXVII of the

Order Dated October 27, 2015 and Fed. R. Civ. P. 65 and any response thereto, it is hereby

ordered that Defendants' Motion is GRANTED.

By the Court:

_____

Stewart Dalzell, J.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | : | |
| | : | |
| **STATE OF CONNECTICUT,** | : | |
| **OFFICE OF ATTORNEY GENERAL, and** | : | |
| | : | |
| **COMMONWEALTH OF PENNSYLVANIA,** | : | **CIVIL ACTION NO.15-5777** |
| **OFFICE OF ATTORNEY GENERAL,** | : | |
| | : | |
| **Plaintiffs** | : | |
| **v.** | : | |
| | : | |
| **CLICK4SUPPORT, LLC,** | : | |
| **a Connecticut limited liability company, et al** | : | |
| | : | |
| **Defendants** | : | |

## Motion of Spanning Source, LLC, George Saab, Chetan Bhikhubhai Patel and Niraj Patel For Live Testimony at the Preliminary Injunction Hearing Pursuant to § XXVII of the Order dated October 27, 2015 and Fed.R.Civ.P. 65

Defendants Spanning Source, LLC, George Saab, Chetan Bhikhubhai Patel and Niraj Patel (known collectively as the "Pennsylvania group"), by their undersigned counsel, respectfully move under § XXVII of the Order dated October 27, 2015, and Federal Rule of Civil Procedure 65 that this Honorable Court hold an evidentiary hearing before entering a preliminary injunction or extending the TRO relief it had granted in the Order. In support of the motion, the Pennsylvania group relies on what is set forth below and in the attached Brief as well as the matter they shall be filing later today under separate cover pursuant to the Order.

**The Moving Parties**

1.      George Saab ("GS") is an individual who resides in Stowe, MA.  He is married and has the normal expenses and financial profile of a typical middle class individual.  A summary of his financial situation is set forth in Exhibit "A".  GS is employed full-time by

Hewlett Packard Corporation as an engineer and manager on certain projects.  GS has been employed by Hewlett Packard on a full-time basis for more than 20 years.

2.      Chetan Patel ("CP") is an individual who resides in Newtown, PA.  CP is married and has one minor child who resides with him and his wife and has another child who is 23 and who receives financial assistance and support from CP.  A summary of his financial situation is set forth in Exhibit "A".  For many years, CP was employed by ISGN as head of mergers and acquisitions.  In 2013, CP moved on to establish local businesses including an auto repair business, a wood trading business, an auto parts wholesale business and a call center that provides information about affordable prescriptions to consumers.  Consumers were referred by the pharmaceutical companies and physicians because the consumers could not afford prescription medicine.  CP works full-time managing these businesses.

3.      Niraj Patel ("NP") is an individual who resides in New Hope, PA.  NP is married and has two minor children who reside with the family.  NP worked for GMAC for 13 years during which time he was a thrifty saver and accumulated a modest financial estate.  NP has, through investments made during the 1990's and early 2000's, accumulated a financial estate worth approximately $4.5 million as set forth on Exhibit "A".  NP is employed by Selex ES as a technology consultant and advisor, and in addition, NP is an Adjunct Professor at Temple University teaching courses relating to technology and business.

4.      GS, CP and NP acquired the bulk of their savings and assets before 2012, as set forth more fully below.

5.      Spanning Source, LLC ("SS") is a Pennsylvania corporation formed in 2007 for the purposes of providing consulting services in the area of computer data management and

business organization.  The history of SS is that in 1991, while NP was employed by UNISYS,

he attended an industry conference where he met GS who was also employed by UNISYS.  The

two became friends and over the years stayed in touch.  NP and CP are brothers and have a close

relationship.  CP met GS through NP and all three of them became friends.  NP, CP and GS

talked about one day forming a company so that they could interact in a business venture that

would have grown out of their friendship.  In 2007, GS was approached with an opportunity to

consult for a company (Johnson & Johnson), separate and apart from his employment at HP and

he approached NP to join with him in that endeavor.  Accordingly, NP and GS formed SS to

carry out that consulting opportunity and later invited CP to join SS.  Accordingly, SS was

formed as a technical/business management consultant, but after the initial client, the parties

were preoccupied with their "day jobs" to actively pursue other work and SS became dormant.

6.      In September of 2011, as set forth in the email string in Exhibit "B", GS received

an email from a person he had met who resided in India, Hemant, who offered GS the

opportunity to act as a liaison between an entity in India and a merchant bank that could process

credit card transactions.  Hemant would get a portion of the fees.  As set forth in Exhibit "B", the

company in India was to perform a legitimate service offering assistance to consumers who had

computer and other electronic equipment that was off warranty and not functioning properly.

The proposal was to act as a liaison between that company which was known as and

appeared on the internet as www.1xpertiz.com and a merchant bank.

The proposal was that SS would receive a percentage of the "top line" sales for acting as

a liaison with a merchant bank in the U.S.  GS had no experience in that area and thought this

would be a good opportunity to revive SS and contacted NP.  NP agreed and he and GS

undertook to learn how to act as a liaison with a merchant bank.  CP was not involved at this time, although he was an owner of SS.

7.     Thereafter, GS and NP were introduced to Abhishek Gagneja ("Abhi") who said he resided in India and was interested in having a merchant bank process customer credit cards, that his technicians all had obtained certification from Microsoft (or appropriate entities, i.e., Dell, HP or had an education in engineering) to perform services on the Windows operating system and that this business would rely on the customers finding Abhi's company through Bing, Google or another search engine and then call a telephone number to speak to a technician who would then obtain permission to link onto a customer's computer.  The goal was to repair or adjust whatever was causing the customer's problems and to offer customer service 24/7 for the customer's computer for a specified period of time.  This seemed to be a good opportunity to GS and NP and they negotiated an agreement with Abhi's company which was known as Innovazions ("INN").  This was memorialized in an agreement between INN and SS, which is attached hereto as Exhibit "C".

8.     Thereafter, during the end of 2012 and in the beginning of 2013, SS made arrangements with TD Bank to be their merchant bank.  This involved establishing a fictitious name in Pennsylvania for the URL which consumers would use because the consumers would be charged under the name of the URL.  The first URL was Click4Support.com.  The consumer would visit Click4Support.com and after reading the webpage, if they were interested, would call the listed telephone number.  If the customer, after listening to the information, wanted to purchase the services offered by Click4Support.com, a credit card charge would be entered in the name of the URL.

**The Role Played by Spanning Source, LLC in the Business of Innovazions**

9.     The mechanical process from the standpoint of SS was as follows:

● A customer would agree to services offered by Click4Support.com (or whatever other URL INN was using.)

● A ticket would be created by a sales rep for INN which identified the customer, the amount of the services and the program the customer purchased.

● The ticket would go from Click4Support.com to an entity known as Authorize.Net. Authorize.Net is a service provider to merchant banks and it performs the function of acquiring from the payment gateway processor that the customers have a valid credit card and sufficient charging balance to enter the proposed charge, which it acquires from the customer's credit card bank. Authorize.Net would then send an electronic inquiry to such card provides as American Express, MasterCard and Visa, and each of the card providers would then make an electronic inquiry.

● If the inquiry of Authorize.Net produced a positive result, that result would be communicated electronically to Click4Support.com, and it would then process the ticket with the merchant bank (which in the beginning was TD Bank).

● TD Bank would then notify whichever of the credit card issuers associated with the consumer's card and money would then be deducted from the consumer and paid to TD Bank.

● TD Bank would then deduct its commission (other merchant banks would also take an agreed amount as a reserve for a chargeback (i.e., where the customer would dispute the charge)) and remit the balance to the authorized agent for Click4Support which was SS.

- SS would then deduct its agreed commission of approximately 4.1% as well as $13.50 per hour from each of its employees who were handling refunds; and the balance was remitted to a bank account that had been specified by INN.

10.     In the process mentioned above, when Click4Support received the authorization it sometimes performed an additional verification of the sale but because SS was not involved in that aspect, it has only hearsay information about it that was mentioned by Abhi.

11.     SS did not have its own office nor did it have any staff who performed the functions of assistants, secretaries, bookkeepers, receptionists, or managers.  Moreover, GS was in Boston and CP and NP worked out of different locations in Pennsylvania fulfilling the obligations of their "day jobs."  SS had agreed with INN that when consumers called they would hear on the telephone the option of pressing 1 for sales, 2 for technical support, or 3 to be connected to the customer service/refund center that was operated in Pennsylvania.  The phone system that SS used was Voice-Over-Internet (Five 9), meaning that people who worked for SS that handled refunds would receive the customer's calls on their laptops.  During 2012 and most of 2013, SS employed two individuals on an hourly basis to handle calls from consumers requesting complaints.  One of the employees, Lori Melair, worked at an unrelated company and her employer allowed her to also answer calls because her time was not fully used.  The other employee who answered calls, Charlene Grande, worked out of her home. Each of these employees used their own personal laptops and were paid $12.00 per hour based on their submission of time to SS.  SS added $1.50 per hour to cover its overhead and bookkeeping expenses related to these employees.

12.     No one involved in the Pennsylvania group had anything to do with the advertising of services by Click4Support, the staffing of technicians, or the sales they made, that

were used by Click4Support, the methods or procedures, the technicians or procedures implemented by click4suport with regard to its customers, or anything else involved in the business of Click4Support.

13.     Requests for refunds were communicated to SS through emails sent to Click4Support, consumers who called the telephone number and pressed 3 on their phone.  Two SS employees also conducted research regarding the customer support services.  That research included checking with the Better Business Bureau service to determine if it had received any complaints from consumers, as well as checking with general consumer complaint websites.  The principals of SS had signed guaranties with the merchant bank in the event that the merchant bank paid sums that exceeded the funds available from the sales.  Accordingly, from time to time, GS would pose as a customer and order services from Click4Support and in each instance, he received proper treatment.

14.     The first merchant bank, TD, had a low threshold and tolerance for chargebacks and a company such as Click4Support that offered services instead of a product, was not a good match for it.  As the Pennsylvania group learned when talking to representatives of other banks, services purchased on the Internet are subject to a higher level of "buyer's remorse" especially when the problem they had with their computer was fixed and over time they decided they did not need additional service, some consumers would then challenge their sale which would result in a chargeback.  Accordingly, when the chargebacks for Click4Support rose to over 3%, it was necessary to find a new merchant bank.  EMS, a new merchant bank was substituted for TD bank.  It charged SS a higher rate for processing credit card charges, but it also had a higher threshold for accepting chargebacks.

7

15.     During the period from 2012 through around September 2015, INN or Abhi requested that SS perform the merchant bank and refund services for a variety of different urls. In some instances, SS presumed that this was due to high chargebacks and in other instances SS had no inkling why they were asked to set up new accounts for urls.  Moreover, several of the urls for which they established merchant accounts never did any business.

16.     Around August of 2013, Abhi indicated that he intended to move from India to the United States and obtained a L1 work visa.  He proposed that the services being performed by SS be merged with the services performed by INN into a single entity and that he would come to the United States to discuss the details.  In anticipation of that, a new entity known as iSourceUSA, LLC ("iSource") was established as a Pennsylvania corporation.  The accountant for SS, Mayur Mehta, filed a pro forma fictitious name registration in Pennsylvania listing the business owners as INN and SS in September of 2013.  But nonetheless, the combination of operations of SS and INN never took place.  Instead, iSource was essentially used a substitute for SS until around April 4, 2015.

17.     From mid-2013 until April 4, 2015, iSource performed the identical functions as SS and the funds were distributed exactly as if SS had been acting as the merchant bank liaison and refund center.  Accordingly, approximately 4.1% was deducted from the net sales and paid to SS along with the cost of the telephone answering people and the balance was remitted to a bank designated by INN or Abhi.

18.     In early 2015, the Pennsylvania group for the first time consulted with an attorney with regard to the business SS was doing with INN and sought guidance with regard to Abhi's proposal that the operations of INN and SS be joined under the banner of iSource.  Upon legal advice, the Pennsylvania group rejected Abhi's proposal and provided him with an agreement

their attorney drafted that followed the existing arrangement, but in addition established

additional reserves for refunds.  This was communicated to Abhi in

April of 2015, and he rejected it.  Accordingly, the individuals of the Pennsylvania group

notified Abhi that they had withdrawn from iSource in an email sent on April 4, 2015, a copy of

which is attached hereto, as Exhibit "D".  Thereafter, the Pennsylvania group operated through

SS and performed the same role of merchant bank liaison and refund center.

19.     Because the sales being processed by SS increased, it became necessary for

refund clerks to be housed in a common location and accordingly, Abhi rented office space in

Bensalem, PA and paid for cubicles to be built in that space.  At its peak, there were 5 refund

clerks working that office handling refunds that were generated by the sales of INN.  INN

generated in excess of $1 million in sale per month, and refunds averaged 11.8% and in some

months, were much lower.  When the office was established, it was necessary to have someone

available to act in the HR/supervisory capacity and CP agreed to sit in the office in the event that

one of the refund clerks had a question about his or her employment or the job in which event,

CP would contact GS.  In exchange for sitting in the office, CP negotiated with Abhi for the use

of 5 cubicles for use of employees who work for PPARX Call Center (described above) which

had nothing to do with INN or Abhi.

**The Hardship Of The Asset Freeze On Defendants George Saab, Chetan Patel And Niraj Paten**

20.     The asset freeze obtained by the FTC in its secret, ex parte motion, has caused an

extreme hardship to GS, CP and NP.

21.     The asset freeze has resulted in GS, CP and NP being unable to pay their home

mortgages, real estate taxes, insurances, car payments, utilities, all school related expenses of

their children, food, gas, medical and dental expenses, and other ordinary daily living expenses. In addition, all payments made through ACH or other automatic payment systems have been rejected due to the asset freeze and fees associated with the rejected payments are accruing.  In addition, the individual Defendants' checks, that were written prior to the asset freeze, are bouncing and incurring fees.  In short, the asset freeze has wreaked havoc on Defendants' lives, caused much stress and discord in their respective marriages and is destroying their lives.

22.     The asset freeze has resulted in the individual Defendants' credit scores (along with their spouses' credit scores) to be negatively impacted.  This negative impact will have long term effects on these Defendants and will affect their ability to secure credit in the future.

23.     By way of example, NP has applied and interviewed for a senior executive level position in the mortgage industry and the asset freeze will impact his ability to be hired for the position.  The employer will perform a background and credit check which will reflect the effect of the asset freeze, thereby causing the potential employer to reject NP.

**Additional Material**

24.     Based on the size of the filing of the FTC and the fact that SS did not have an office but an enormous amount of material under the Order was to be collected and filed, there was not sufficient time nor resources to put in this Motion all of the matter that was to be raised and accordingly, additional material will be supplied in further submissions.

**Proposed Witnesses**

25.     It is necessary for George Saab, Chetan Patel and Niraj Patel to testify about the circumstances mentioned above, the hardship and impact of the asset freeze, the fact that the asset freeze has impounded and caused adverse effects on businesses and assets that are

completely unrelated to anything described in the FTC's Complaint, and which were assets that were created or obtained without regard to any of the activities described by the FTC.

27.     If the parties are unable to testify, the allegations in the Complaint that are erroneous or which paint a false picture would go unchallenged.

28.     Similarly, the allegations in the FTC's other submissions draw erroneous conclusions and make false accusations against the Pennsylvania group.

29.     Because the Pennsylvania group, as noted, did not adhere to regular corporate formalities, did not have a regular office, and treated the venture as an investment rather than a business, mistakes made in documents have been misconstrued by the FTC in a way that paints the Pennsylvania group as sinister and having more involvement with INN and Abhi than is true.

30.     The testimony under oath of the individuals in the Pennsylvania group will establish all of this and there is no legal basis for their assets to be frozen.

**The Freezing of the Individuals' Assets Must Be Terminated Immediately**

31     The pro forma Order the Court signed granting the TRO allows the freeze to extend for fourteen days after the Order was granted.

32.     The evidence at a hearing would show that this is intolerable, and unwarranted. Rather, the evidence will prove that the freeze should be lifted immediately since it does not help the Plaintiffs or their constancies due to the nugatory financial resources of the Pennsylvania group's individuals on the one hand, but on the other hand, would ruin the lives of the individuals and their families if the freeze is not promptly terminated.

33.     Moreover, the freeze has crippled, hindered or stopped the operations of companies and businesses that had nothing to do with any matter covered by the Plaintiffs' case, but where these businesses have had their bank accounts and financial assets frozen merely because the individuals' names were associated with the businesses. These include, inter alia:

  a.  ACM Foods, Inc.

  b.  Carada, Inc.

  c.  Spanning Source PPARX Call Center

**Relief Requested**

Accordingly, Defendants George Saab, Chetan Patel and Niraj Patel respectfully request that the court allow live testimony at the preliminary injunction hearing as described above  and that the freeze on the assets against George Saab, Chetan Patel and Niraj Patel be lifted and dissolved as to them and all their unrelated companies and individuals.

/s/ Gary Green_____
Gary Green, Esquire
Larry M. Keller, Esquire
Samantha Green, Esquire

**SIDKOFF, PINCUS & GREEN, P.C.**
2700 Aramark Tower
1101 Market Street
Philadelphia, PA  19107
lmk@sidkoffpincusgreen.com

Dated: November 5, 2015                    Attorney for Defendants Spanning Source, LLC, George Saab, Chetan Bhikhubhai Patel and Niraj Patel

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | : | |
| | : | |
| **STATE OF CONNECTICUT,** | : | |
| **OFFICE OF ATTORNEY GENERAL, and** | : | |
| | : | |
| **COMMONWEALTH OF PENNSYLVANIA,** | : | **CIVIL ACTION NO.15-5777** |
| **OFFICE OF ATTORNEY GENERAL,** | : | |
| | : | |
| **Plaintiffs** | : | |
| **v.** | : | |
| | : | |
| **CLICK4SUPPORT, LLC,** | : | |
| **a Connecticut limited liability company, et al** | : | |
| | : | |
| **Defendants** | : | |

**Memorandum of Law**

**A.    The material facts asserted by the Plaintiffs are contested; and an evidentiary hearing is needed and required**

The FTC as the alleged main investigator, and the other Plaintiffs, in a secret, *ex parte* motion, obtained a TRO that included a freeze of the assets of the individual Defendants, George Saab, Chetan Bhikhubhai Patel and Niraj Patel, and appointed a receiver for Spanning Source, LLC.  (These Defendants are known as the "Pennsylvania group"). The facts alleged by the Plaintiffs about the Pennsylvania group in the FTC's papers are materially wrong, or plainly false, and under the law, no asset freeze or receivership was or is warranted. While a TRO can be legally granted to preserve the status quo, a preliminary injunction requires an evidentiary hearing where the facts are contested. As the Third Circuit held in *Elliott v. Kiesewetter,* 98 F.3d 47, 53-54 (3d Cir.1996),

> In determining whether the district court should have held an evidentiary hearing, we must focus on whether there were any issues of fact in dispute with respect to the Freeze Order. A district

1

> court cannot issue a preliminary injunction that depends upon the
> resolution of disputed issues of fact unless the court first holds an
> evidentiary hearing. *Professional Plan Examiners of New Jersey,*
> *Inc. v. Lefante,* 750 F.2d 282, 288 (3d Cir.1984). We have
> recognized, however, that "a decision [to enter an order] may be
> based on affidavits and other documentary evidence if the facts are
> undisputed and the *relevant* factual issues are resolved." *Bradley*
> *v. Pittsburgh Board of Education,* 910 F.2d 1172, 1175–76 (3d
> Cir.1990) (emphasis added).

In the instant case, Plaintiffs have made allegations that improperly impute to the

Pennsylvania group the alleged misdeeds, and business operations of Innovazions Inc., one of the

other Defendants which provided computer support services to customers who contacted

Innovazions' support technicians who were in India. Plaintiffs misconstrue their role that the

Pennsylvania group played, and falsely lump them together with Innovazions, as if the

Pennsylvania group was involved in the products, services and advertising of Innovazions.

Plaintiffs asserted, supposed facts that painted the easily disproven scenario that the

Pennsylvania group was in a common enterprise with Innovazions, and that the individual

defendants in the Pennsylvania group directly participated in, or had authority to control the

deceptive practices of Innovazions. However, among the many discrepancies in the Plaintiffs'

assertions that an evidentiary hearing would prove, is the fact that the Pennsylvania group had

two limited functions: (1) the Pennsylvania group acted solely as an independent seller of

services as a liaison to merchant banks that processed credit cards; and (2) the Pennsylvania

group set up and operated, an after-sale mechanism to identify and process refunds.

An evidentiary hearing would show further that, contrary to the Plaintiffs' contentions,

the Pennsylvania group had nothing to do with the operations of the web sites consumers visited,

the handling of telephone calls from consumers who were buying services or seeking to have the

people in India fix their computers, or in the marketing of those services to consumers. After a

sale, the Pennsylvania group's only role was to determine from emails, Better Business web sites or elsewhere if customers of the websites wanted a refund, and to then, on a no-questions-asked basis, to pay and process the refunds. The evidence offered by the proposed witnesses for the Pennsylvania group will contradict and disprove the assertions advanced in the Complaint, and moving papers filed by Plaintiffs.

**B.      An evidentiary hearing is needed to show the financial and life-altering hardships and harm caused by freezing the financial assets of the individual members of the Pennsylvania group**

Unlike the expected individuals in an asset-freeze case, the members of the Pennsylvania group are hardly big-shot, masters of the universe types who have vast fortunes obtained from the activities the FTC challenged. The individuals here are middle class wage earners who made either nothing or very little from the operations the FTC challenges in this case, and the money they did make was for performing services that had nothing to do with the activities that gave rise to the FTC's action. As shown in the financial reports the members of the Pennsylvania group provided to the FTC as required by the Order, two of the individuals live hand-to-mouth off of their jobs or small businesses that are unrelated to the activities covered by the Plaintiffs' case, and the other has assets accumulated after working more than 30 years for GMAC and saving his pennies. None of them have assets traceable to the activities Plaintiffs challenge, and this is hardly a case where the freeze *vel non* could make a bit of difference to the Plaintiffs.

By contrast, the individuals in the Pennsylvania group have to pay tuition for minor children, car payments for what would be considered used-cars  driven by typical middle class consumers, heat and other utility bills, life and medical insurance bills, food costs, and the expenses that ordinary people have. These are not people of extravagant life styles, but instead, if they have their finances frozen, the lives of their families will (and have) become endangered,

their social status will be ruined in their middle class communities, and lifetimes of honest, hard

work will be flushed away. The freeze, if not lifted, will cause irreparable harm and stigma that

cannot be repaired when they prove that the allegations of the FTC were hasty and wrong.

Accordingly, the nature of the harm the Court must consider when balancing the equities

in connection with granting a preliminary injunction requires evidence, and the Defendants have

the right to put that evidence on the record.

**C.     An evidentiary hearing is needed to establish why the freeze of the assets and finances of the individual members of the Pennsylvania group must be terminated**

The pro forma Order the Court signed granting the TRO allows the freeze to extend for

fourteen days after the Order was granted. The evidence at a hearing would show that this is

intolerable, and unwarranted. Rather, the evidence will prove that the freeze should be lifted

immediately since it does not help the Plaintiffs or their constancies due to the nugatory financial

resources of the Pennsylvania group's individuals on the one hand, but on the other hand, would

ruin the lives of the individuals and their families if the freeze is not promptly terminated.

Respectfully submitted,


/s/ Gary Green
Gary Green, Esquire
Larry M. Keller, Esquire
Samantha Green, Esquire

**SIDKOFF, PINCUS & GREEN, P.C.**
2700 Aramark Tower
1101 Market Street
Philadelphia, PA  19107
lmk@sidkoffpincusgreen.com
Attorney for Defendants.
 Spanning Source, LLC, George Saab,
 Chetan Bhikhubhai Patel and Niraj Patel

DATED:        November 5, 2015

4

# EXHIBIT A

# Chetan Patel

| | |
|---|---|
| Monthly Income | PEP Boys Consulting: $1,000 per month |
| Assets | 1. Cash on Hand: $200<br>2. Financial Institutions: $24,493<br>3. Non-publically traded stock: $2000<br>    a.   REIT Capital Solutions<br>    b.   2007<br>    c.   Face value<br>    d.   $2000<br>4. Amounts Owed: $144,000<br>    a. Trionofo Financial LLC<br>    b. 2008<br>    c. Original amount was $150,000<br>5. Life Insurance Policy:<br>    a.   Guardian Life<br>    b.   2004<br>    c.   $750,000<br>6. Deferred Income<br>    a. HSBC IRA<br>    b. $1,572<br>    c. 2003<br>7. Vehicles - $18500<br>8. Real Property<br>    a. Purchase price - $750,000 in 2008<br>    b. Appraised value - $900,0000<br><br>Total = $1,840,765 |
| 2012 Click4Support Income | $0 |
| 2013 Click4Support Income | $0 |
| 2014 Click4Support Income | $0 but received loan of $50,000 |
| 2015 Click4Support Income | $0 but received loan of $72,000 |
| Unrelated Businesses | ACM Foods, Inc.: 2014: $6,000 in draw 2015: $6,000 in draw. Started in 2011. |

|  | CNP Partners: Started in 2000. No income, dormant company but it owns shares of ISGN valued at $980,000. Market value is lower (approximately $50,000).<br><br>Crossborder Component Company: Started in 2011. Lost money, no income. Exited out in 2014.<br>3C Auto Repair, Inc. – Investment over $100,000. No income, exited out in 2014.<br><br>Shree Vinayak Foods LLC II – Initial investment October 8, 2013 of $15,000. Exited out with no cash due to unprofitable operations on October 1, 2015.<br><br>Shree Vinayak Food LLC – Started August 9, 2011. Had shares but the company shut his shares down. Exited out of the company in 2012. |
|---|---|
| Monthly Expenses | 1. Food and other living expenses – Approximately $2400<br>   *life insurance premiums - $1945<br>2. Mortgage - $5743 per month includes property tax and insurance.<br>3. Son's apartment - $600<br>4. Utilities - $500<br>5. Medical expenses: $400<br>6. Credit card payments: $1000 |

# Niraj Patel

| Monthly Income | Selex ES: $4500 after taxes bi-monthly<br>Interest Income: $100 per month<br>Investment in Jamesburg Hotel: $500 per month<br>Require: a board position gets board fees of $10,000-$20,000 per year |
|---|---|
| Assets | 1. Cash on Hand: $200<br><br>2. Financial Institutions: $366,282<br>  a. TD Bank<br>  b. Covenant<br>  c. Ally<br><br>3. Publically traded securities: $808,440<br>  a. BNY Mellon – Came from Wells Fargo<br>  over a decade ago<br>  b. Fidelity - Recently<br><br>4. Non-publically traded stock: $400,000<br>  a. Jamesburg Hotel (2007) and Misc.<br><br>5. Life Insurance Policy:<br>  a. Northwestern Mutual in a trust - $2<br>  million 9/14/05 moved into trust in 2012.<br>  b. Mony Policy - $2 million 2006-2007.<br><br>6. Deferred Income - $519,029<br>  a. IRA – Old GMAC pension now at<br>  Northwestern Mutual<br>  b. Fidelity – Selex 401k<br><br>7. Vehicles: <$15,000, the rest are leased<br><br>8. Real Property<br>  a. $369,000 – Belmar, NJ<br>    i. No debt<br>    ii. Purchased in 2004<br>  b. $1,600,000– Newhope, PA<br>    i. Debt = $430,000<br>    ii. Purchased/built in 2001<br>  c. $142,000 – Beaver Falls, PA<br>    i. Original purchase price $124,000 in<br>    2004.<br>  d. ~$400,000 44 Nassau Street<br>    i. Owned under LLC 50/50 with Niraj's |

| | |
|---|---|
| | wife<br><br>Total = $4,640,000 |
| 2012 Click4Support Income | $0 |
| 2013 Click4Support Income | $0 but $64,500 loan |
| 2014 Click4Support Income | $0 but received loan of $111,000 |
| 2015 Click4Support Income | $0 but received loan of $88,600 |
| Unrelated Businesses | CNP Partners: Started in 2000. No income, dormant company but it owns shares of ISGN valued at $980,000. Market value is lower (approximately $50,000).<br><br>Crossborder Component Company: Started in 2011. Lost money, no income. Exited out in 2014.<br><br>TE2N became Appforward: no income<br><br>FWDVU an application: no income<br><br>ATMOSFI wifi crm company: no income<br><br>44 Nassau Street LLC – owns the property in Princeton, NJ |
| Monthly Expenses | 1. Food and other living expenses – Approximately $4,257.3<br>   *life insurance premiums - $ 22,000 a year<br>    *Auto/home/umbrella policy - $1500 per month Ace Insurance<br>2. Mortgage – $3,847.71 per month property tax: $ 49,750.64 (all properties)<br>3. Utilities - $1800<br>4. Medical expenses: Dental - $300-500 per month, Eyes - $200 month<br>5. Credit card payments: Balance of $6,428.82<br>6. Bills owed:<br> a. Landscape bill - $2000<br> b. Architect - $3500<br> c. Replaced Lexus lease during TRO bill has not come in yet<br>7. Tuition: $80,000 per year for two children |

# George Saab

| | |
|---|---|
| Monthly Income | HP/EDS: approx. $6,424 per month <br> a. 2015 - $116,000 <br> b. 2014 - $125,000 <br> c. 2013 - $116,000 <br> d. 2012 - $111,000 <br> e. 2011 - $117,000 <br> f. 2010 - $115,000 <br><br> Tekcetera Inc: <br> a. 2014: $706.0 <br> b. 2013: $15879.00 |
| Assets | 1. Cash on hand - $3500 <br> 2. Financial Institution <br>    a. Bank of America - $814.5 <br>    b. InTouch Credit Union- $26,702 <br> 3. Publically Traded Securities <br>    a. Ameriprise Brokerage - $11,482 <br>    b. Merrill Lynch - $3973.28 <br>    c. Fidelity - $10,759.51 <br> 4. Deferred Income Arrangements - $405,338 <br> 5. Vehicle - Current value - $8,000 <br> 6. Real Property <br>    a. Purchase price - $444,000 <br>    b. Current price - $600,000 |
| 2012 Click4Support Income | $0 |
| 2013 Click4Support Income | $0 but $64,500 loan |
| 2014 Click4Support Income | $0 but received loan of $111,000 |
| 2015 Click4Support Income | $0 but received loan of $88,600 |
| Unrelated Businesses | None |
| Monthly Expenses | 1. Food and other living expenses – Approximately $2,005 <br> 2. Mortgage – $3,376 per month property tax: $832 monthly <br> 3. Utilities - $625 <br> 4. Medical expenses: $498 <br> 5. Credit Card Balance: $1906.28 |

EXHIBIT B

From: **George Saab**<gsaab@spanningsource.com>
Date: Wed, Sep 7, 2011 at 5:17 PM
To: Niraj Patel <npatel@caradainc.com>, Chetan Patel <cpatel1589@gmail.com>

Hemant has brought us a deal that I would like to move forward with.

This company "http://www.ixpertz.com/" will start with a team of 12-15 OB callers that are selling "IT Support Services" for all of the items mentioned in the website.  They will charge ON AVERAGE $150 per subscriber to provide on-line and chat technical support.  For ANYONE in the United States that is out of service on existing warranties and support agreements on any devices, this company will support it.  They will do so through a network of support individuals in India.

SS will make 4.5% of top line revenue. In return, we control the money flow through our opening a MERCHANT account.  We will keep a reserve in the Account equal to about a one month cash flow.  They will maintain the OB caller ID 8XX number and make sure the number is not already spoofed (blacklisted).

My questions are:

1) What are the TAX implications to SS for establishing this Merchant Account?  (Niraj, you have one, how does that work?)  I can ask Mayur?

I would like to get started.  I know the Company behind the website.
George

----------
From: **George Saab**<gsaab@spanningsource.com>
Date: Sat, Sep 10, 2011 at 7:48 AM
To: Hemant Raghav <hemant.raghav@gmail.com>

Good Day Hemant,

I am ready to proceed with this proposal.  Let's discuss next steps and move it forward.

Thank you,
George

----------
From: **Hemant Raghav**<hemant.raghav@gmail.com>
Date: Sun, Sep 11, 2011 at 5:02 PM
To: George Saab <gsaab@spanningsource.com>

Hi George,

Sounds Good. Let us catch up tomorrow.

Thank you,
Hemant --

# EXHIBIT C

## Master Service Agreement

THIS AGREEMENT ("**Agreement**") is made and entered on **18ᵗʰ May 2012** by and between

**www.click4support.net,** (referred to as C4S) an online entity of Innovazion Incorporated a business and marketing consulting firm for its technical support, data recovery and help desk services – **Innovazion Inc is** duly incorporated and existing under the laws of the State of Connecticut, USA, having its registered office at 12 Main St, Essex, CT USA 06426 hereafter referred to as "First Party" which expression shall mean and include its associates, affiliates and assigns of one part.

And

**Spanning Source, LLC**, (referred to as Spanning Source) a management, strategy, advisory and IT development company incorporated under the laws of Pennsylvania, USA  having its corporate office at 27 Hickory Lane, Stow, MA 01775 (hereinafter referred to as "Second Party" which expression shall mean and include its successors and assign) of the other part.

First Party has decided to enter an agreement of exclusivity with Second Party to include the Rights of Agency, for a period of 365 days starting from 18ᵗʰ May 2012 valid for twelve months till 31ˢᵗ May 2013, with annual auto-renewal unless terminated per the terms of this Agreement. This Agreement is based on the objectives of facilitating payment solution for the business of www.click4support.net, as mutually agreed.

## NOW THEREFORE THE PARTIES AGREE AS FOLLOWS

1. C4S will process payment for it new acquired customers thru Spanning Source, in lieu of payment facilitation Spanning Source will be paid a management fee, which is 8.5% of Net Amount (Net Amount defined as monies received from Merchant "Gross Sales net of Return's, Refunds and Cancellations processed within the legally stipulated cancellation period, fee's etc") processed weekly.

2. C4S will manage the entire sales and services areas of the engagement for clients.

3. Clients will remain the property of C4S.

4. Spanning Source will be held harmless against any claim of services provided by C4S.

**Payment Cycle:**

Spanning Source will make net payments weekly to C4S for payment processed after subtracting its fee.  Payments will be setup and processed through an electronic means such as automated clearing house (ACH) or ePayment Processing.

Spanning source will hold one week of payment as security which may not exceed $5000. On termination of agreement the same needs to be returned within 30days to C4S.

Any reversals or refunds will be adjusted in the following week.

### Confidential and Intellectual Property

a) Spanning Source undertakes to treat as confidential all documents and information received from the C4S and/or gained in the course of its work on behalf of the C4S and further undertakes not to, at any time during and/or after the Engagement Period of this Agreement, divulge or use any information in relation to the C4S or the CLIENT's affairs or business or method of carrying on business.

b) The Spanning Source, consultants or officials shall not copy any information /property nor shall they carry with them any of the aforesaid in any form or manner whatsoever and use the same subsequently.

### Non Compete and Jurisdiction

Both the parties agree not to poach clients & consultants of either party and not compete or open similar businesses for one year after termination of the contract.

This Agreement and all questions/disputes concerning the validity, interpretation or performance of any of its terms or provisions, or of any rights or obligation of the parties here to be submitted for final and binding settlement to arbitration under the Arbitration and Conciliation Act. The venue of Arbitration shall be in Connecticut, USA.

### Terminations:

Either party can cancel the agreement by serving one month's written notice to other party for which, without harm will invoke the completeness of any pending transactions, promises, gifts or other obligations disclosed at such time of notice.

Seven days delay in payment transfer by Spanning Source to C4S will also result in termination of this agreement.

### Accepted and agreed.

**Innovazion Inc**

Innovazion Inc

*Abhishek G.*
Auth Sign.

Signature...........................
Printed Name: Abhishek Gagneja

**Spanning Source, LLC**

5/18/12

Signature...........................
Printed Name: George Saab

# EXHIBIT D

**From:** Chetan Patel [mailto:cpatel1589@gmail.com]
**Sent:** Saturday, April 4, 2015 at 6:24 PM
**To:** George Saab <gsaab@spanningsource.com>, Abhishek Gagneja <abhishek@innovazioninc.com>, Hemant Raghav <hemantraghav@gmail.com>
**Subject:** Fwd: FW: Go-Forward Relationship Model effective April 1, 2015 ( Private)


Hemant and Abhi

we agree with you that the agreement should be between Spanning Source and Inivizion.

Niraj, George, and my self resign from isourceusa, llc as officers and relinquish our ownership to abhi and you.

attach is the resignation letter from all 3 of us.


Chetan Patel


---------- Forwarded message ----------
From: **George Saab** <gsaab@spanningsource.com>
Date: Saturday, April 4, 2015 at 5:24 PM
Subject: FW: Go-Forward Relationship Model effective April 1, 2015 ( Private)
To: Chetan Patel <cpatel1589@gmail.com>

---

**From:** Hemant Raghav
**Date:** Saturday, April 4, 2015 at 3:30 PM
**To:** George Saab
**Subject:** Re: Go-Forward Relationship Model effective April 1, 2015 ( Private)

Hi George,

I told you that Abhishek would review and give me his detailed opinion about the contract. He and I spoke today and went through the agreement.

They prefer to terminate if this is your final agreement. I suggest to hear their concerns and reach a middle path ( for clarity, increasing SS fees is not a concern).

At the same time, I also have discussed this with one of my other friend and he suggested me a risk free arrangement that his company is using with one of their US partner for a similar work. We can discuss the same before our Wednesday call and you may like it too.

Thank you,

Hemant

On Sun, Apr 5, 2015 at 12:53 AM, Hemant Raghav <hemant.raghav@gmail.com> wrote:

Hi George, Niraj & Chetan,

The 'Buyer- Seller' agreement will not be signed between Innovazion and iSource ( I already mentioned this and the reason is due to huge reserve under iSource). Also, we need to discuss the terms of agreement in our upcoming call next week before taking it to closure.

Premier you can terminate the agreement, Inz would like to hire their own US Technicians.

Thank you,

Hemant

## CERTIFICATE OF SERVICE

I, Larry M. Keller, hereby certify that, on this 5th day of November 2015, a true

and correct copy of the foregoing *Motion of Spanning Source, LLC, George Saab, Chetan*

*Bhikhubhai Patel and Niraj Patel for Live Testimony at the Preliminary Injunction Hearing*

*Pursuant to §XXVII of the Order dated October 27, 2015 and Fed.R.Civ.P. 65*, along with

supporting *Memorandum of Law* was served upon the following counsel of record via email

and U.S. mail:

Fil M. De Banate, Esq.
Christopher D. Panek, Esq.
Nicole J. Guinte, Esq.
Federal Trade Commission
1111 Superior Avenue East, Suite 200
Cleveland, Ohio 44114
fdebanate@ftc.gov
cpanek@ftc.gov
nguinto@ftc.gov
Attorneys for Plaintiff Federal Trade Commission

Patricia M. Hamill, Esquire
Conrad O'Brien PC
Centre Square West Tower
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
phamill@conradobrien.com
Receiver

Sandra G. Arenas, Assistant Attorney General
110 Sherman Street
Hartford, Connecticut 06105
Sandra.Arenas@ct.gov
Attorney for Plaintiff State of Connecticut

Nicole R. Ditomo,
Deputy Attorney General Bureau of Consumer Protection
15th Floor, Strawberry Square
Harrisburg, Pennsylvania 17120
nditomo@attorneygeneral.gov
Attorney for Plaintiff Commonwealth of Pennsylvania
Office of Attorney General

Larry M. Keller
Larry M. Keller, Esquire
**SIDKOFF, PINCUS & GREEN, P.C.**
2700 Aramark Tower
1101 Market Street
Philadelphia, PA  19107
lmk@sidkoffpincusgreen.com
Attorney for Defendants,
 Spanning Source, LLC, George Saab,
Chetan Bhikhubhai Patel and Niraj Patel

DATED:        November 5, 2015