IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** *et al.*,<br>Plaintiffs,<br><br>v.<br><br>**CLICK4SUPPORT, LLC,** *et al.*,<br>Defendants, | **CIVIL ACTION NO. 15-5777** |

**PLAINTIFF FEDERAL TRADE COMMISSION'S RESPONSE TO
PENNSYLVANIA DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW
(DOC. 23)**

Plaintiff Federal Trade Commission ("FTC") submits this response to the Supplemental Memorandum of Law, (Doc. 23), filed by Defendants Spanning Source LLC ("Spanning Source"), George Saab ("Saab"), Chetan Bhikhubhai Patel ("C. Patel"), and Niraj Patel ("N. Patel") (collectively, "Pennsylvania Defendants").

The Pennsylvania Defendants do not seriously dispute[1] the underlying technical support scam in this matter described in detail in the FTC's memorandum in support of its *ex parte* motion for a temporary restraining order ("TRO Memo") and the numerous accompanying sworn declarations and exhibits. In fact, the Pennsylvania Defendants corroborate the manner in which consumers are lured into this scam, specifically "through Bing, Google, or another search engine

---

[1] The Pennsylvania Defendants claim that "from time to time, [Saab] would pose as a customer and order services from Click4Support and in each instance, he received proper treatment." (Doc. 18, ¶ 13; *see also* Doc. 21, ¶¶ 37-39.) This bald assertion flies at the face of the hundreds of consumer complaints filed against Click4Support that described a pattern of misrepresentations and scare tactics, a similar pattern also demonstrated during the FTC's undercover calls to Click4Support.

and then [consumers] call a telephone number to speak to a technician who would then obtain permission to link onto a customer's computer." (Doc. 18, ¶ 7; Doc. 22, ¶ 30.)

Instead, the Pennsylvania Defendants attempt to distance themselves from this deceptive scheme by denying involvement in and knowledge of it, even in the face of overwhelming evidence to the contrary—including the very evidence that they present to the Court.

As discussed in the TRO Memo and further explained below, there is an overwhelming likelihood that the FTC will succeed on the merits, showing that the Pennsylvania Defendants and the rest of the Defendants in this matter are liable for injunctive and monetary relief. Given this, it is equitable and necessary to preserve the Court's ability to grant effective final relief to the numerous consumer victims in this matter, including the potential for consumer redress. Accordingly, the FTC respectfully urges the Court to enter the proposed preliminary injunction.

I. **The FTC demonstrates an overwhelming likelihood of success on the merits, showing that the Corporate Defendants operate as a common enterprise and should therefore be held jointly and severally liable for each other's law violations.**

The Pennsylvania Defendants assert that they will not be held part of a common enterprise.[2] They argue that Spanning Source "mainly sold the service of helping to establish credit card processing by a merchant bank," (Doc. 23, p. 1), and its "role was essentially that of an independent facilitator of bank related services that had no involvement with the sales that resulted in the credit card charges [that Spanning Source] would allow to be processed." (*Id.*, p. 2.) They also argue that there is no evidence that Spanning Source "shared common ownership, profits, managements, location, or other elements." (*Id.*, p. 3.) These arguments misconstrue the common enterprise doctrine, ignore the evidence presented by the FTC, and are contradicted by the evidence and information that the Pennsylvania Defendants have put forth.

---
[2] The common enterprise doctrine applies only to corporate entities, *see, e.g., FTC v. NHS Sys., Inc*. 936 F. Supp. 2d 520, 533 (E.D. Pa. 2013) (Sanchez, J.), so this argument concerns only Spanning Source and the other Corporate Defendants in this case.

As detailed in the FTC's TRO Memo, courts in this and other districts recognize the common enterprise doctrine and consider several factors when determining its existence.[3] No single factor is controlling. "Inasmuch as no one factor is controlling, courts must consider 'the pattern and frame-work of the whole enterprise….'"[4]

The FTC has presented exhibits showing a number of these common enterprise factors, including common control, unified advertising and marketing, and commingling of funds, among others. Additional information and documents obtained since the Court entered the temporary restraining order further demonstrate these common enterprise factors. For example, Innovazion Inc. ("Innovazion"), iSourceUSA LLC ("iSourceUSA"), and Spanning Source, share the offices located in 3220 Tillman Road, Suite 504, Bensalem, PA.[5] The FTC also obtained additional evidence confirming commingling of funds.[6]

While a showing of any number of these factors certainly reinforces the finding of a common enterprise, the crux of the court's common enterprise inquiry is whether the corporate defendants acted together in furtherance of a common scheme. "[E]ntities constitute a common enterprise when they exhibit…qualities that may be demonstrated by a showing of strongly

---

[3] *See, e.g., NHS Sys.*, 936 F. Supp. 2d at 533; *FTC v. Direct Benefits Grp., LLC*, 6:11-cv-1186-Orl-28TBS, 2013 U.S. Dist. LEXIS 100593, at *53 (M.D. Fla. July 18, 2013) (internal quote omitted); *FTC v. Wash. Data Res.,* 856 F. Supp.2d 1247, 1271 (M.D. Fla. 2012), *aff'd*, 704 F.3d 1323 (11th Cir. 2013); *FTC v. Consumer Health Benefits Assoc.*, 10-CV-3551 (ILG), 2011 U.S. Dist. LEXIS 92389, at *15-16 (E.D.N.Y. Aug. 18, 2011); *FTC v. Skybiz.com, Inc.*, 01:-CV-396-K(E), 2001 U.S. Dist. LEXIS 26314, at *13-14 (N.D. Okla. Aug. 2, 2001).

[4] *Consumer Health*., 2011 U.S. Dist. LEXIS 92389, at *15-16 (quoting *Del. Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964) (per curiam)); *cf. Skybiz*, 2001 U.S. Dist. LEXIS 26314, at *14-15 (concluding that a common enterprise exists even though the "FTC has not demonstrated sufficiently a sharing of office space and officers…or of unified advertising" because the "FTC has presented sufficient evidence of a maze of interrelated companies") (citing *FTC v. Wolf*, 94-8119-CIV-FERGUSON, 1996 U.S. Dist. LEXIS 1760 (S.D. Fla. Jan 30, 1996)).

[5] PX 71 (pictures taken from the immediate access of the business premises on October 28, 2015); PX 72 (Bensalem Township Application document showing that Innovazion is the lessee of the office, while iSourceUSA and Spanning Source used it); *see also* Doc. 21, ¶ 76.

[6] PX 73 (statements showing frequent deposits of funds by Spanning Source and iSourceUSA into Innovazion's bank account).

interdependent economic interests…. Thus, [a common enterprise exists where] all of the companies were beneficiaries of and participants in a shared business scheme, [with] the common revenue generated in the course of that scheme…."[7] Where "[e]ach company played a crucial role in the scheme, and no company could operate the scheme independently," a common enterprise exists.[8] Indeed, "[i]t is not necessary that the FTC prove any particular number of entity connections and any specific connection. Instead, it must be proved that the defendants maintained an 'unholy' alliance."[9]

Here, Defendants Click4Support, LLC ("C4S-CT"), Innovazion, iSourceUSA, and Spanning Source have operated as a maze of interrelated network of companies, each crucial to the scheme, to accomplish one goal: to scare innocent consumers into paying their hard-earned money for unnecessary technical support services. In their own filings, the Pennsylvania Defendants recount in great detail the formation of this unholy alliance which culminated in an agreement signed on May 18, 2012 (the "2012 Agreeement"). (Doc. 18, ¶¶ 6-10, Exhs. B-C.; *see also* Doc. 21, ¶¶ 15-32; Doc. 22, ¶¶ 24-40;) Under this agreement, Innovazion would handle the solicitation of consumers (*e.g*., by arranging and paying for the internet advertisements, consumer-facing websites, and telephone services) and the fulfillment side of the operations

---

[7] *FTC v. Network Servs. Depot, Inc.,* 617 F.3d 1127, 1143 (9th Cir. 2010).
[8] *FTC v. HES Merchant Servs. Co*., Inc. No. 6:12-cv-1618-Orl-22KRS, 2014 U.S. Dist. LEXIS 171292, at *17 (M.D. Fla. Nov. 18, 2014) (finding that a corporate defendant was part of a common enterprise because it obtained for the other corporate defendants two merchant payment processing accounts, which allowed the scheme to accept and process consumers' credit card payments).
[9] *FTC v. Kennedy*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008); *accord Direct Benefits*, 2013 U.S. Dist. LEXIS 100593, at *55 ("The corporate entities worked cooperatively and complemented one another in inducing consumers to enroll in the discount club products"); *FTC v. Ivy Capital*, 2:11-CV-283 JCM (GWF), 2013 U.S. Dist. LEXIS 42369, at *40 (D. Nev. March 26, 2013) ("The roles of each entity varied, but all had a distinct role to play as part of the scam.");

(*e.g.*, by providing the telemarketers and "technicians" who sold and provided the technical support services to consumers).

On the other hand, the Pennsylvania Defendants would make sure that consumers were charged for the technical support services (*e.g.*, by obtaining the merchant payment processing account necessary to process credit card payments). (Doc. 18, ¶¶ 6-10, Exhs. B-C; *see also* Doc. 23, p. 3). Initially, Spanning Source played this role until iSourceUSA took over in mid-2013 until April 2015. (Doc. 18, ¶ 17; Doc. 21, ¶ 76.). Under the 2012 Agreement, the Pennsylvania Defendants would also perform the "customer service/refund center"[10] side of the operations (Doc. 18, ¶¶ 11, 13; *see also* Doc. 21, ¶¶ 41-52; Doc. 22, ¶¶ 49-60)—this was necessary to minimize the chargebacks on the merchant account which, in turn, would prevent the merchant account from being terminated. (Doc. 21, ¶ 41.) As discussed in the FTC's TRO Memo, Defendants C4S-CT and Bartolotta also played this role, receiving the consumer complaints. Finally, the 2012 Agreement included a division of revenues derived from their scheme. (Doc. 18, ¶¶ 9, 17 & Exh. C; *see also* Doc. 21, ¶ 32; Doc. 22, ¶¶ 39-40) The Pennsylvania Defendants admit that they continued to operate this common enterprise until at least April 2015. (Doc. 18, ¶ 18 & Exh. D; *see also* Doc. 21, ¶ 96; Doc. 22, ¶ 103.)

Put simply, what the Pennsylvania Defendants have described in their court filings is the Corporate Defendants' participation in a common enterprise, operating during May 2012 to April 2015, "where all of the companies were beneficiaries of and participants in a shared business scheme, with the common revenue generated in the course of that scheme."[11] Therefore, the Corporate Defendants are highly likely to be held jointly and severally liable for each other's law violations

---

[10] Spanning Source employed two individuals to handle consumer complaints and refund requests, for which it took an additional cut of the revenues. (Doc. 18, ¶ 11.)

[11] *Network Servs.,* 617 F.3d at 1143.

**II.     The FTC demonstrates an overwhelming likelihood of success on the merits, showing that the Individual Defendants should be held individually liable for their companies' law violations.**

The Pennsylvania Defendants assert that Saab, C. Patel., and N. Patel will not be held individually liable for their involvement in the scheme. At the outset, they actually concede their involvement in it, although downplaying it as merely "moonlighting [in an] undertaking that did not require serious effort." (Doc. 23, p. 4.) But then they argue, first, that Saab, C. Patel., and N. Patel "had no involvement in the sales or marketing of the products that were offered by the websites." Second, they claim that Saab, C. Patel., and N. Patel did not know the "people in India who interacted [with consumers]," seemingly arguing that they had no knowledge of the misrepresentations by the telemarketers and "technicians" to consumers.

These arguments fail. First, whether an individual defendant personally participated in the deceptive acts or "personally made misrepresentations is irrelevant so long as the FTC has shown that he had authority to control the corporations' deceptive practices."[12] Here, the FTC has offered numerous exhibits showing the authority to control possessed by Saab, C. Patel., and N. Patel, who are corporate owners and officers. Further, these individuals had complete control over the merchant accounts, which is essentially the financial lifeline of the entire enterprise. If they were seriously interested in stopping the harm to consumers—which they knew was happening, as discussed below—they could have stopped processing the credit card payments or require corrective action subject to the withholding of the use of the merchant accounts.

Second, the requisite knowledge to establish individual liability can be satisfied by evidence that the individual defendant was "aware of…customer complaints and the excessive chargebacks."[13] The FTC has already offered exhibits showing that Saab and C. Patel (and

---

[12] *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005).
[13] *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573, 574 (7th Cir. 1989);

Bartolotta) were aware of and/or personally handled consumer complaints from the Better Business Bureau ("BBB") and chargeback activity. Significantly, the Pennsylvania Defendants' own court filings show the great extent of knowledge and involvement by Saab, C. Patel, and N. Patel regarding consumer complaints and chargebacks. (Doc. 18, ¶¶ 11, 13; Doc. 19, ¶¶ 32-34; Doc. 21, ¶¶ 41-52 & Exh. B; Doc. 22, ¶¶ 49-60) Moreover, during the immediate access of the Bensalem, PA office, the FTC and Receiver discovered two large filing cabinets containing, among other things, numerous BBB complaints, Chargeback Notification letters and other chargeback-related documentation, and notifications from various state law enforcement agencies.[14] Similar documents were found during the immediate access of the business premises in Essex, CT.[15]

Given their authority to control over and requisite knowledge of the unlawful practices committed in the name of their enterprise, Saab, C. Patel, and N. Patel are highly likely to be found individually liable for the law violations of the Corporate Defendants.

---

[14] PX 74. Importantly, these documents include the consumer's recounting of his or her experience; therefore, they provide insight to Saab, C. Patel, and N. Patel (and their employees) into the business practices that consumers are complaining about and might be unlawful.

[15] PX 75.

Respectfully Submitted,

Dated: November 8, 2015  /s/ *Christopher D. Panek*
**FIL M. DE BANATE**, OH Bar # 86039
**CHRISTOPHER D. PANEK**, OH Bar # 80016
**NICOLE J. GUINTO**, OH Bar # 89319
Federal Trade Commission
1111 Superior Avenue East, Suite 200
Cleveland, Ohio 44114
Tel: (216) 263-3413 (de Banate)
Tel: (216) 263-3406 (Panek)
Tel: (216) 263-3435 (Guinto)
Fax: (216) 263-3426
fdebanate@ftc.gov
cpanek@ftc.gov
nguinto@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**CERTIFICATE OF SERVICE**

I certify that the **PLAINTIFF FEDERAL TRADE COMMISSION'S RESPONSE TO PENNSYLVANIA DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW (DOC. 23)** was filed electronically on November 8, 2015 and is available for viewing and downloading from the ECF system. The Receiver and all Defendants, other than iSourceUSA LLC, have been served via ECF. Defendant iSourceUSA LLC has been served via U.S. mail and via electronic mail:

**Mayur Mehta**
853 Second Street Pike
Suite B107
Richboro, PA 18954
*Registered Agent for*
*Defendant iSourceUSA LLC*