IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CLICK4SUPPORT, LLC, et al. | : | NO. 15-5777 |

FILED
NOV 10 2015
MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

MEMORANDUM

Dalzell, J.                                                                 November 10, 2015

### I.  Introduction

We consider here whether to grant a preliminary injunction against defendants[1] following our issuing of a temporary restraining order ("TRO") on October 27, 2015, and whether to modify the conditions we imposed in our TRO should we decide to issue a preliminary injunction in this matter.

Plaintiffs, the Federal Trade Commission ("FTC"), the Commonwealth of Pennsylvania, and the State of Connecticut, bring this action pursuant to Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a), the Telemarketing Act, 15 U.S.C. § 6102(c), the Connecticut Unfair Trade Practices Act ("CUTPA"), C.G.S.A. § 452-110, and the Pennsylvania Unfair Trade Practices and Consumer Protection Act ("UTPCPL"), 73 P.S. § 201.  We have federal question jurisdiction over the FTCA and Telemarketing Act claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

After holding a hearing yesterday and this morning pursuant to Fed. R. Civ. P. 65(b)(3), we set forth our reasons below for extending most of the conditions the TRO imposed, with the

---

[1] The four corporate defendants are Click4Support, iSourceUSA, Innovazion, and Spanning Source. The four individual defendants are Bruce Bartolotta, George Saab, Chetan Bhikhubhai Patel, and Niraj Patel.

exception of lifting the asset freeze on the individual defendants' personal bank accounts, until further Order of this Court.

## II. Procedural History and Findings of Fact

On October 26, 2015 plaintiffs filed an ex parte motion for a TRO and an ex parte motion to temporarily seal the entire file until the defendants were served. After an ex parte, on-the-record meeting with plaintiffs' counsel on October 27, 2015, we granted both of plaintiffs' motions and appointed Patricia Hamill, Esquire as the temporary receiver.

After considering the filings by the parties and the evidence presented at the hearing, we make the following findings of fact.

### A. The Defendants Participate In A Common Enterprise

The corporate defendants operate a common business enterprise. They have common or shared owners, officers, and employees. See Pl.'s Ex. ("PX") 24-25. The companies also share office locations and business addresses, as well as websites and phone numbers. See PX 6, PX 26. The corporate defendants all share at least one bank account at Chesapeake Bank. See PX 1, PX 6.[2] Most notably, the corporate defendants transact their business through an interrelated maze in which Click4Support and Innovazion provide the technical services and Spanning Source manages the merchant accounts and processes refunds to consumers. See Mot. for Live Testimony (docket entry #18), Decl. of Saab at ¶¶ 25-90, Decl. of C. Patel at ¶¶ 28-42, Decl. of N. Patel at ¶¶ 38-102.

The individual defendants are also involved in this common enterprise. Bruce Bartolotta is an owner of Innovazion, iSourceUSA, and Click4Support. See PX 2, PX 6, PX 24, PX 26, PX 27. He has access to a bank account held in the name of Innovazion, he has registered and paid

---

[2] There are many bank accounts that the defendants have access to, but the Chesapeake Bank account is the only one for which plaintiffs have produced evidence showing that all of the defendants had used that account.

for the defendants' telephone services and business websites, and he responds to consumer complaints filed with the Better Business Bureau ("BBB"). See, e.g., PX 1, PX 6, PX 9, PX 22, PX 23, PX 67. George Saab is an owner of Spanning Source. See PX 25, PX 27. He is also an authorized signer for Spanning Source's bank accounts, has obtained merchant accounts that process millions of dollars in consumer payments, and responds to consumer complaints lodged against defendants with the BBB. See PX 6, PX 7, PX 14, PX 67. Chetan Bhikhubhai Patel is an owner and officer of Spanning Source. See PX 27. He is an authorized signer for Spanning Source's bank accounts, has obtained one merchant account for Spanning Source through which the defendants processed over $8 million in sales in 2014, and entered into the lease of the virtual office used by Spanning Source. See PX 1, PX 6, PX 7, PX 8, PX 25. Finally, Niraj Patel is an owner and officer of iSourceUSA and Spanning Source. See PX 27. He is an authorized account signer for several Spanning Source bank accounts and pays for the virtual office that Spanning Source and iSourceUSA use. See PX 6, PX 7, PX 8, PX 25.

### B. The Defendants Falsely Claim That They Are Affiliated With Well-Known Tech Companies

The defendants told consumers that they were affiliated with well-known technology companies such as Google, Apple, Microsoft, Comcast, and Dell. See, e.g., PX 40, PX 41, PX 43, PX 44, PX 46-51, PX 54, PX 60, PX 63, PX 67. These consumers believed those representations. See, e.g., PX 43 ("He led me to believe he was an Apple tech…"); PX 45 ("At the time, I believed that Uber Tech Support[3] was affiliated with Apple and that I could trust the company."); PX 51 ("I called the phone number…and specifically asked the individual if he was with Google Support. He said "Yes," so I asked for his assistance in resolving my email problem."). But, the companies were in no way affiliated with any of these technology

---

[3] Uber Tech Support is a name used by defendant Click4Support for some of its services.

companies. See, e.g., PX 36 (declaration from Apple stating that the defendants "are not contracted by Apple" and "are not authorized to make or receive calls on behalf of Apple"), PX 37 (declaration from AT&T stating that AT&T had no contracts with the defendants), PX 38 (declaration from Dell averring that the defendants "are not authorized to make or receive calls on Dell's behalf"), PX 39 (declaration from Microsoft that "Microsoft has not authorized, nor has it contracted with any" of the defendants).

### C. The Defendants Falsely Represent That They Have Detected Security Or Performance Issues On Consumers' Computers And Convince Those Consumers To Pay For Services That Do Not Improve The Performance Of Computers

Perhaps most troubling of all, the corporate defendants tell consumers that there are security or performance issues with their computers and that the defendants can provide services -- for a fee -- to remedy those issues, when in reality the defendants provided no meaningful services. Consumers would call the defendants after seeing a phone number displayed on Internet advertisements. See, e.g., PX 41, PX 42, PX 44, PX 46, PX 48-52, PX 54, PX 55, PX 62- 64, PX 66, PX 70. Once on the phone with consumers, the defendants would tell them that their technicians needed to access the consumers' computers via remote access to diagnose any possible problems. Id. and PX 1. The consumers would then begin a remote access session with the defendants by visiting a website or downloading a software application. See, e.g., PX 41-43, PX 47-49, PX 51, PX 54-62, PX 64, PX 65, PX 70.

Once the defendants had gained access to a consumer's computer, they would convince the consumer that common items within their personal computers were evidence of viruses, performance issues, or security breaches within the consumer's computer. Defendants would show numerous "error," "warning," and "stopped" services messages in the consumer's computer's Event Viewer and claim these messages were evidence of viruses. See, e.g., PX 40,

4

PX 42, PX 44, PX 54, PX 55, PX 60, PX 62. But these messages are in fact common on personal computers and not necessarily an indication of viruses or other computer problems. See, e.g., PX 35 ("[it] is normal for Windows systems to collect hundreds or thousands of such messages…").[4] The defendants would also use the computer's Internet properties to convince consumers that "untrusted" and "fraudulent" certificates were evidence that hackers had gained access to their computers or that there were security breaches on their machines. See, e.g., PX 40, PX 41, PX 43, PX 46-52, PX 57-65, PX 70. These certificates, however, in no way indicate the presence of hackers or security breaches in a computer. See PX 35.[5] In fact, they are common on most computers. The defendants would even provide "repairs" during these remote

---

[4] On this point, defense counsel objected to FTC Investigator John Vega's testimony regarding the expert report written by Harold R. Pomeranz, found at PX 35. Defense counsel argued that the FTC should not be allowed to introduce through backdoor testimony this report from Mr. Pomeranz, stating that it is inappropriate during what he called a "bench trial."

We have two points of clarification. First, the hearing was not a bench trial: it was a preliminary injunction hearing with no binding effect on the merits of this case. Second, we took Mr. Vega's testimony for what it's worth, fully understanding that his testimony regarding the expert report was hearsay and that it should be afforded little or no weight. We understand the Federal Rules of Evidence, and informed both parties before the hearing that we would not be taking objections (save for ones dealing with hostility toward a witness) for this very reason. The Supreme Court of the United States has endorsed both of these positions:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981) (internal citations omitted). Moreover, we have come to conclusion Mr. Pomeranz's report accompanied by a sworn declaration, which we must note was not objected to by the defendants, provides sufficient evidence to support the claim that "error messages" were not indicative of viruses or other computer problems.

[5] See footnote 4.

access sessions, even though these "repairs" had no effect on a computer's performance or security, and in some cases actually damaged the computer's security and operating systems. See, e.g., PX 1, PX 35, PX 44, PX 63.

The defendants would then convince consumers to pay for these services by credit card over the Internet. See, e.g., PX 1, PX 40, PX 42 (stating that a customer had been charged $2,797), PX 43-53, PX 55-66, PX 69, PX 70, PX 73. When customers expressed reservations about paying the defendants for those "services," the defendants pressured consumers by stating that if they waited any longer their computers would not work. See PX 58, PX 59 ("I wanted to think about it but they scared me by saying these 'outside devices' could do some serious damage"), PX 62 (stating that the defendants "presented [me] with the 'doomsday scenario' that my computer and router were infected"), PX 63 (same). Using these tactics, the defendants convinced various consumers to pay them a total of $17,900,324.00 through 55,966 separate sales transactions over a two-year period. PX 1.

### III.  Discussion

Plaintiffs request that we issue a preliminary injunction against defendants extending the conditions the TRO imposed. The plaintiffs are seeking this injunction pursuant to Section 13(b) of the FTCA.[6] See 15 U.S.C. § 53(b). The statute states in relevant part that:

> Whenever the Commission has reason to believe--
>
> **(1)** that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
> **(2)** that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order

---

[6] The FTC and courts throughout the country refer to this section of the FTCA as Section 13(b). The Court would be interested to know why this is so, since the relevant language is under 15 U.S.C. § 53(b). But, we refer to it as Section 13(b) for the sake of uniformity with other federal courts.

> of the Commission made thereon has become final, would be in the interest of the public -- the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond.

Id. This standard differs from the traditional test for issuing a preliminary injunction.[7] Several Courts of Appeals have held that the FTCA provides the appropriate standard for district courts to use when deciding whether to issue a preliminary injunction. See F.T.C. v. Univ. Health, Inc., 938 F.2d 1206, 1217–18 (11th Cir. 1991) F.T.C. v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1028-29 (7th Cir. 1988); F.T.C. v. Warner Communications, Inc., 742 F.2d 1156, 1160 (9th Cir. 1984); F.T.C. v. Food Town Stores, Inc., 539 F.2d 1339, 1343–44 (4th Cir. 1976). Further, our sister court in New Jersey has also used Section 13(b)'s standard when the FTC seeks injunctive relief under the FTCA. See F.T.C. v. Millennium Telecard, Inc., No. CIV.A. 11-2479 JLL, 2011 WL 2745963, at *2 (D.N.J. July 12, 2011); F.T.C. v. Check Investors, Inc., No. 03–2115, 2003 U.S. Dist. LEXIS 26941, at *13 (D.N.J. July 30, 2003). To be sure, our Court of Appeals has not explicitly adopted this view. But we see no reason to stray from the path forged by other Courts of Appeals and our sister court, and therefore will use the standard provided by the FTCA to determine whether to issue a preliminary injunction in this matter.

Thus, to justify its request for a preliminary injunction, the FTC must show that it is likely to succeed on the merits in this matter and that the balance of the equities weighs in favor

---

[7] See Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc., 143 F.3d 800, 803 (3d Cir. 1998) (stating that district court judges must consider four factors when ruling on a motion for injunctive relief: "(1) the likelihood that plaintiff will prevail on the merits at final hearing; (2) the extent to which plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest").

7

of granting injunctive relief. See Warner Communications, 742 F.2d at 1160; Millennium Telecard, Inc., No. CIV.A. 11-2479 JLL, 2011 WL 2745963, at *2. We separately analyze each of these factors.

### A. The FTC's Likelihood Of Success On The Merits

As stated, one of the two elements the plaintiffs must demonstrate is that it is likely to succeed on the merits as a prerequisite to us granting injunctive relief, and we find that the plaintiffs have met this burden. The FTCA provides that "unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C. § 45(a)(1). To establish that an act or practice is deceptive, the FTC must demonstrate that "(1) there was a representation; (2) the representation was likely to mislead consumers acting reasonably under the circumstances; and (3) the representation was material." F.T.C. v. NHS Sys., Inc., 936 F. Supp. 2d 520, 531 (E.D. Pa. 2013) (citing F.T.C. v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003)). The second element does not require proof of intent to deceive on the part of the defendants, see F.T.C. v. Patriot Alcohol Testers, Inc., 798 F. Supp. 851, 855 (D. Mass. 1992) (citing Beneficial Corp. v. F.T.C., 542 F.2d 611, 616 (3d Cir. 1976)), nor does it require proof that the customers were actually deceived. NHS Sys., Inc., 936 F. Supp. 2d at 531. A representation is material "if it contains information that is important to a consumer's purchasing decision." Id. (citing F.T.C. v. Davison Assocs., Inc., 431 F. Supp. 2d 548, 559 (W.D. Pa. 2006)). Moreover, defendants' "explicit claims or deliberately-made implicit claims…are presumed to be material. Id. (citing In re Nat'l Credit Mgmt. Grp., L.L.C., 21 F. Supp. 2d 424, 441 (D.N.J. 1998)).

We find that the plaintiffs have produced substantial evidence establishing that the defendants engaged in unfair or deceptive practices in violation of the FTCA. The defendants made representations to consumers regarding both their non-existent affiliations with widely-

8

known tech companies and their ability to fix any problems plaguing the consumers' computers. These representations were not only likely to mislead reasonable consumers into believing that something was wrong with their computers, but in fact did mislead these consumers into paying nearly $18 million for services that, in many cases, did not increase the performance of the consumers' computers and, in fact, actually damaged some consumers' computers. Finally, these representations were material. Both the claims that the defendants were affiliated with giant tech companies and that their services could help alleviate computer troubles are important, nay, vital, to any consumer's purchasing decision. These claims were made over the phone to consumers to explicitly lure the consumer into paying for the defendants' services. The plaintiffs have produced sufficient evidence demonstrating that defendants used "unfair or deceptive acts or practices" in violation of the FTCA, and have therefore shown that they are likely to succeed on the merits in this case.

We also find that all of the corporate defendants face potential liability in this matter because they operate as a common enterprise. Companies that take part in a common enterprise are jointly and severally liable for each other's unlawful acts or practices. NHS Sys., Inc., 936 F. Supp. 2d at 533. To determine whether a common enterprise exists, courts consider the following factors: (1) whether business is transacted through a maze of interrelated companies; (2) common control over the business; (3) shared officers and employees; (4) shared offices; (5) shared advertising and marketing; (6) commingling of funds; and (7) evidence that reveals no real distinction between the companies. Id. Here, the corporate defendants transacted business through a maze of interrelated companies, as Click4Support and Innovazion provided the technical support to consumers and Spanning Source managed the merchant accounts and processed refunds to the consumers. See Mot. for Live Testimony (docket entry #18), Decl. of

Saab at ¶¶ 25-90, Decl. of C. Patel at ¶¶ 28-42, Decl. of N. Patel at ¶¶ 38-102. The corporate defendants have common or shared owners, officers, and employees. See PX 24-25. The companies also share office locations and business addresses, as well as websites and phone numbers. See PX 6, PX 26. The corporate defendants all share at least one bank account. See PX 1 and PX 6. It is therefore clear that the corporate defendants operate as a common enterprise.

Defendants Saab, C. Patel, and N. Patel claim that they are not part of this common enterprise and thus the plaintiffs have not demonstrated that they are likely to succeed on the merits against them. We disagree. An individual defendant is personally liable for injunctive and monetary relief based on his corporation's violations of the FTCA if he (1) participated in or had authority to control the deceptive acts, and (2) had knowledge of the misrepresentations, was recklessly indifferent to the truth of the misrepresentations, or was aware of the high probability of fraud along with intentional avoidance of the truth. NHS Sys., Inc., 936 F. Supp. 2d at 533-34. Here, all of the defendants had control over the alleged deceptive acts. Saab, N. Patel, and C. Patel managed the merchant accounts through which Click4Support and Innovazion processed their transactions. Without their involvement, the corporate defendants would not have been able to collect payments from consumers. The three individuals also knew or were aware of the high probability of fraud. Saab participated in the deception by claiming to consumers that Click4Support was authorized to perform technical support for AT&T and McAfee, when in fact it was not. See PX 6. Both C. Patel and N. Patel were aware of the extremely high rate of chargebacks, which is a red flag that something is amiss.[8] See Decl. of C. Patel at ¶ 33, Decl. of

---

[8] A normal rate for chargebacks is around 1%, and the defendants experienced chargebacks of 3% or higher at different times over the past several years. In fact, one of their bank accounts was closed because of the high rate of chargebacks. See Decl. of N. Patel at ¶ 69.

10

N. Patel at ¶ 69. We thus hold that the evidence supports the finding that the individual defendants are likely to be held personally liable for their roles in this enterprise.

**B.      Balance Of The Equities**

The plaintiffs must also demonstrate that a balance of the equities favors injunctive relief. As a general matter, public equities receive greater weight than private equities in suits brought by the FTC under the FTCA. See, e.g., World Travel Vacation Brokers, Inc., 861 F.2d at 1030 ("[a]lthough private equities may be considered, public equities receive far greater weight"); Warner Communications, 742 F.2d at 1165 (stating that public equities are weighed more heavily than private equities); Millennium Telecard, Inc., No. CIV.A. 11-2479 JLL, 2011 WL 2745963, at *2 (same). This does not mean, however, that we ignore the private equities of the case. Millennium Telecard, Inc., No. CIV.A. 11-2479 JLL, 2011 WL 2745963, at *2. On the contrary, we must carefully consider the private interests when weighing the equities. See F.T.C. v. Nat'l Tea Co., 603 F.2d 694, 697 (8th Cir. 1979) ("we do not think that it was the intention of the statute's drafters to totally shield from judicial view the private equities which may merit inclusion in the courts' equitable overview").

Here, the defendants have a significant private interest in avoiding the granting of a preliminary injunction. The terms of the TRO have crippled their business operations and frozen their personal and corporate bank accounts. But, the defendants do not have a legitimate interest in being permitted to continue to operate an unlawful enterprise. Nat'l Credit Mgmt., 21 F. Supp. 2d at 461 (citing F.T.C. v. World Wide Factors, Ltd., 882 F.2d 334, 347 (9th Cir. 1989)). The personal assets of the individual defendants are also subject to freezes since the individual defendants' alleged participation in the deceptive practices could make them liable for monetary damages. Id. (citing World Travel Vacation Brokers, Inc., 861 F.2d at 1031). But, courts

imposing asset freezes pursuant to preliminary injunctions or TROs in FTC actions have routinely released funds to allow defendants to pay their reasonable attorneys' fees and cover living expenses. See, e.g., F.T.C. v. Construct Data Publishers, No. 13-CV-01999, 2014 WL 7004999, at *8 (N.D. Ill. Dec. 11, 2014); F.T.C. v. Amy Travel Svc., Inc., 875 F.2d 564, 575–76 (7th Cir. 1989); F.T.C. v. Windermere Big Win Int'l, Inc., No. 98 C 8066, 1999 WL 608715, at *6 (N.D. Ill. Aug. 5, 1999); see also F.T.C. v. QT, Inc., 467 F. Supp. 2d 863, 866 (N.D. Ill. 2006) (noting that it is routine for courts to allow a defendant facing an FTC civil suit to be given access to certain funds so they can pay their attorneys because this is "necessary to enable defendants to obtain representation" and ensure a defendant may "defend against the FTC's charges."); F.T.C. v. Circa Direct LLC, 912 F. Supp. 2d 165, 168 (D.N.J. 2012). Moreover, district courts across the country have released funds in very similar circumstances. In F.T.C. v. Health Formulas, LLC, No. 2:14-CV-01649-RFB, 2015 WL 2130504, at *4 (D. Nev. May 6, 2015), the district court judge allowed the temporary receiver to release funds frozen by a temporary restraining order to the defendants for the express purpose of covering living expenses and attorneys' fees. A court in New Jersey also approved a Stipulated Preliminary Injunction Order that allowed the temporary receiver to release a specific amount of funds to the defendants on a monthly basis, which the defendants in turn used to pay their attorneys' fees and cover their living expenses. See F.T.C. v. Circa Direct LLC, 912 F. Supp. 2d 165, 168 (D.N.J. 2012).

Here, the individual defendants have demonstrated that they require access to their finances in order to cover their living expenses and attorneys' fees. The defendants have, among other things, missed mortgage payments, had checks bounce, hired attorneys, and been unable to pay expenses related to their children. See Decl. of C. Patel at ¶¶ 48-59, Decl. of N. Patel at ¶¶ 107-131, Decl. of Bartolotta at ¶¶ 15-17, and Decl. of Saab at ¶¶ 100-108. Moreover, the

defendants have had to cancel prepaid vacations and postpone medical procedures, while suffering significant blows to their credit histories. Id. The private equities in this case are therefore insignificant with regard to the corporate operations and their asset freeze, but significant for the individual defendants with regard to their asset freeze.

On the other side of the scale, the public equities are significant. The evidence plaintiffs proffered strongly suggests that the defendants have "taken millions of dollars from tens of thousands of customers through sheer deception," Mot. for TRO at 34, as plaintiffs have shown that the defendants falsely claimed to be associated with large tech companies in order to give them credibility and charged unwary consumers for services that did not address the technology needs of the consumers. Needless to say, it is in the public interest to further prevent the defendants from separating consumers from their hard-earned money through deceptive practices.

Moreover, it is in the public interest to freeze the corporate bank accounts of these defendants in order to permit the victims of this scheme to collect restitution in the event defendants are held liable in the final disposition of this matter. See, e.g., Nat'l Credit Mgmt., 21 F. Supp. 2d at 461 (finding that when a court determines that a reasonable consumer would be misled by representations made by defendants, a freeze of assets is appropriate to preserve those assets for possible restitution awards); Commodity Futures Trading Comm'n v. American Metals Exchange, 991 F.2d 71, 79 (3d Cir. 1993) (holding that when business operations are permeated by misrepresentations and fraud, the likelihood that assets may be dissipated during the pendency of legal proceedings is strong).

We find that, with regard to the corporate defendants, the public equities in this case are weighty, and when compared to the insignificant private interests of the corporate defendants,

the balance of the equities in this matter favor injunctive relief. But we do not find that the public equities outweigh the private equities with regard to the freezing of the individual defendants' bank accounts. We will therefore amend the conditions of the TRO and lift the asset freeze on the personal bank accounts for the individual defendants.

## IV.    Conclusion

The evidence presented in this matter leads us to conclude that the plaintiffs have demonstrated that they are likely to succeed on the merits in this case and that the balance of the equities favors granting injunctive relief. We will therefore grant the preliminary injunction and impose the same conditions contained in TRO issued on October 27, 2015, with the notable exception of lifting the asset freeze on the personal bank accounts of the individual defendants. An appropriate Order follows.